# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00432-CR

---

**Mark James Stevens, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 428TH DISTRICT COURT OF HAYS COUNTY
### NO. CR-19-0238-D, THE HONORABLE WILLIAM R. HENRY, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Mark James Stevens was convicted by a jury of murder and tampering with physical evidence and sentenced to life imprisonment and ten years' confinement, respectively, with the sentences to run concurrently.[1] On appeal, he contends in four issues that the trial court improperly commented on the weight of the evidence in its charge to the jury, that the evidence is legally insufficient to support the jury's finding of guilt for tampering, that the trial court erred by omitting the mandatory parole instruction in its punishment charge, and that the trial court erred by entering a deadly-weapon finding in the murder judgment. We will affirm the trial court's judgments of conviction.

---

[1] The jury also assessed a $10,000 fine as part of Stevens' tampering punishment.

## BACKGROUND

This case arises from a three-way sexual tryst gone awry. On July 26, 2018, Officer Alexander Pinillo and Deputy Daisy Trevino with the Hays County Sheriff's Office (HCSO) were dispatched to a residence in Buda on a welfare call. The 911 caller, Stevens' father, had advised police that his son had possibly been in a fight the night before.

Deputy Trevino testified that Stevens' wife, Jeanette Stevens, answered the front door. When Officer Pinillo asked for Stevens, Jeanette went inside and shut the door. The officers heard a loud scream, and Jeanette returned to the door followed by Stevens, who "looked confused," "kept touching his head," was "shaking" and "breathing heavily," and "kept looking back at his wife." Trevino testified that Stevens had a dried "gash" on his head and was acting strangely, which caused her to call for EMS. Without being asked, Stevens put on a pair of handcuffs that had been hanging on a coat rack by the door.

Trevino testified that Stevens directed the officers to the master bathroom. She noticed that the master bedroom door and locking mechanism were broken and that the doorframe was damaged. In the bedroom, "there was just blood all over," and she observed bedsheets and a bloody pillow on the floor as well as an apparently bloodstained knife on top of a wooden trunk at the foot of the bed. Two tall clothes hampers had been positioned to block access to the bathroom. She observed a man, later identified as Brandon Fontenette, lying on his back on the bathroom floor with his legs beneath him and a pool of coagulated blood under his head. It appeared that Fontenette had been in the bathroom "for a good deal of time," but she saw nothing indicating that his body had been moved.

Trevino also testified that she observed a cell phone and Ziploc bag containing a wallet on the counter of the kitchen bar area. She testified that although she would consider the

2

items to have been in plain view, she would not have been able to see them had she not been inside the home.

Officer Pinillo's testimony was largely consistent with Deputy Trevino's. He testified that when Stevens came to the front door, he was wearing only pajama bottoms and had blood on his hand and a laceration to the top of his head. He could not form complete sentences when speaking with Pinillo and appeared "quite in shock, confused," and surprised to see police. Stevens extended his hand toward Pinillo, who attempted to shake it, but Stevens pulled it back and handcuffed himself. Pinillo testified that when he asked EMS to treat Stevens' hand, Stevens stated, "That is not my blood."

Christopher Uhlaender, a firefighter-EMT with the Buda Fire Department, testified that he and Lieutenant Eric Spillar, a firefighter-paramedic, were dispatched on a call concerning a male with a laceration to his head. En route, the call was updated to add that a second male was unconscious at the scene. Uhlaender testified that Fontenette "was obvious dead-on-arrival when [they] got there" and had been deceased "for an extended amount of time." He further testified that it did not appear that Fontenette's body had been repositioned.

Uhlaender also testified that he performed a full head-to-toe injury examination of Stevens but noted only the laceration to his head. He testified that Stevens had "a lot of dried blood in the area where he said that there . . . might be a possible laceration" but that Uhlaender could not "find a laceration per se" and did not observe "any sort of injuries other than the dried blood on his scalp." On records of the call, he described Stevens as a "male patient with a laceration to the head" but noted that "[d]ue to dried blood [he was] unable to directly observe laceration. No active bleeding." The records likewise stated that Stevens advised that he had been in an altercation, that he had been struck in the head by an "unknown object," and that this

3

was "the sole source of his pain." Uhlaender testified that Stevens' injuries could be categorized as "minor or minimal."

Lieutenant Spillar testified that Fontenette had been dead for more than 30 minutes and that on body-camera footage that was admitted into evidence, he had stated that it appeared that Fontenette had been in that position for more than an hour or two. Like Uhlaender, Spillar testified that he was unable directly to observe Stevens' head wound, that the wound appeared "superficial," and that Stevens was alert and oriented. Spillar testified that he could not remember if Stevens had other injuries.

Dr. Keith Pinckard, the Chief Medical Examiner of Travis County, testified about Fontenette's autopsy. He observed several wounds on Fontenette's body, including a stab wound on his back and 13 shallow BB or pellet wounds "scattered over the body": six to the upper-left chest, one on the left side of the neck, one on the outside of the left upper-arm, four to the left side of the back and backside of the left upper-arm, and one to the front of the left forearm and wrist. Pinckard testified that there were no visible injuries to Fontenette's hands, that the pellet wounds did not appear to have been inflicted postmortem, that there was blunt trauma to Fontenette's neck, and that the stab wound caused his death. He also testified that swabs were taken of Fontenette's hands, fingernails, and penis.

Renee Luna, the supervisor for the HCSO crime scene and evidence units, testified that she responded to Stevens' home twice on July 26th—at approximately 8:30 a.m. and 4:14 p.m. During the first response, she photographed Stevens and the exterior of his home. She testified that in her report, she documented that he had dried blood on his head, small cuts and abrasions on the middle of the left side of his head, scrapes on both of his hands, abrasions

4

on his left elbow, and a swollen and bruised right ankle. She also documented blood on his hands and foot, which he stated was not his.

She testified that she returned to Stevens' home after officers obtained a search warrant. In the master bedroom, she observed blood splatter—caused when "an event occurs that causes someone to bleed and there's some impact"—on the floor, wall, bedding, items in the room, a broken laundry hamper, and in the master bathroom. She obtained swabs of apparent bloodstains from various locations in both the master bedroom and bathroom, but none was submitted for DNA testing.

She also testified that she collected a number of items of physical evidence, including the bloodstained knife, a sheath from the top of a chest of drawers, a second knife coated in a white powder in the master bathroom sink, camo shorts believed to be Stevens', and the Ziploc bag containing Fontenette's wallet and IDs on the kitchen counter. She testified that she observed a similar bag on top of the knife in the bathroom sink, the white powder on which she believed was drywall deposited when the knife was stabbed into a patched area of sheetrock in the master bedroom. In the pocket of the camo shorts were Stevens' wallet and a set of keys later determined to belong to Fontenette.

She further testified that there were liquor bottles in the master bedroom and that a struggle had possibly occurred in the master bathroom. The shower curtain had been moved to a closed position; when it was pulled back, she observed bloodstains on the interior of the shower area. On cross-examination, she testified that she swabbed Stevens' hands, the bloodstained knife, an Airsoft gun, and the empty knife sheath.

M.C., a friend of Stevens' son, A.S., testified that he received a text from A.S. around 3:30 a.m. on July 26th, asking to come to M.C.'s house.[2] M.C. testified that there are probably five houses between his house and the Stevenses' and that it would take him 15 seconds to walk between the houses. He testified that something was going on at Stevens' home that made A.S. want to leave and that A.S. had told him that he heard his father say, "I could kill you." Although M.C. also testified that A.S. may have told him, "He said I could kill you," he testified that he had been "very clear" when speaking with officers within a week of the incident that Stevens had reportedly said, "I could kill you." M.C. testified that his memory would have been "[a] lot better" in 2018.

He further testified that he and A.S. went to Stevens' home that night, that A.S. stated that he did not want to go inside, and that they returned to M.C.'s home. M.C. testified that A.S. had been told to come to his house at least twice before when Stevens was suffering from symptoms of PTSD. He testified that A.S. had described a "PTSD moment" as "sometimes picking up objects and throwing them."

HCSO Corporal Leigh Treat testified that when he arrived at Stevens' home on July 26th, he saw a Dodge Durango, Honda Fit, and Chevrolet Camaro parked in the driveway. He ran the vehicles, and the Camaro came back registered to Fontenette, who was identified by his driver's license photo.

Treat also testified about the contents of security-camera footage from the Railhouse Bar in Kyle that he watched as part of the investigation. On the video, Fontenette, who arrived alone but was later joined by a man named Tommy Rushing, could be seen

---

[2] Because M.C. and A.S. were minors at the time of the alleged offense, we will refer to them by their initials in the interest of privacy. *See* Tex. R. App. P. 9.10(a)(3).

interacting and socializing with Stevens and Jeanette. Rushing appeared to know Stevens, and the two pairs sat together at the bar. Treat testified that Fontenette was primarily interacting with Jeanette; that he and Stevens fist-bumped; that Jeanette later appeared to be "draped over" Fontenette; that Stevens' body language was "[c]losed off, reserved, not engaged"; and that Fontenette moved closer to Jeanette after Rushing left. Treat further testified that at one point, Stevens attempted to kiss Jeanette, but she turned her head away and kissed Rushing instead. When Stevens and Jeanette kissed, she "pulled away" first. Treat testified that Jeanette stood facing Fontenette and with her back to Stevens; that Fontenette and Jeanette engaged in a "two-handed high five"; that they appeared to grasp hands for a second; and that Stevens pulled her back by her hips. After staying at the bar for approximately an hour, Stevens, Jeanette, and Fontenette left the bar around 11 p.m., and their two vehicles appeared to follow each other out of the parking lot.

Melody Jaramio, a criminalist with HCSO's crime scene unit, testified that she collected DNA swabs from Stevens and photographed his injuries at Seton Hays Hospital. His injuries consisted of abrasions on his face, scalp, forehead, left arm, and hands and bruises to his arms, abdomen, right ankle, and the back of his left thigh. She testified that Stevens appeared to be limping in the Railhouse Bar video.

Dr. Jacob Falcon, an ER physician at Seton Hays, testified about his examination of Stevens at the hospital. Stevens reported being assaulted but was unable to elaborate and stated that he did not remember much of the assault. He had "unknown trauma to the head," but no head injuries and only superficial head lacerations. Falcon testified that Stevens' injuries could be consistent with his having been assaulted and that they "[t]heoretically" could have

7

been self-inflicted. He also testified that Stevens had a BAC of .182, which is "toxic," and that his urine tested positive for cannabis and opiates.

Jeri Skrocki, a former HCSO lieutenant, testified that while assisting with the first search of Stevens' home, she observed patched holes in the drywall of the master bedroom and "living area," "which could be consistent with an object or person striking the walls." She testified that during the second search, officers collected BBs from the floor of the master bedroom, an Airsoft gun from a tall dresser in the room, and $CO_2$ cartridges and ammo for the gun from a desk drawer in the living room. She also testified that she remembered the Ziploc bag being collected, that she would consider it to have been in plain view and unconcealed, and that it would have been concealed had she been outside of the home.

HCSO Detective Jennifer Baker testified that having observed the damage to the master bedroom door and doorframe, it was her opinion that the door had been forced from the inside. She also testified that the Ziploc bag had contained Fontenette's driver's license, insurance card, and two debit cards.

Sapana Prajapati, a forensic DNA scientist with a private forensic testing company, testified about the results of DNA testing that she performed in the case at the request of HCSO. The tested items included swabs from Fontenette's fingernails, hands, and penis; Stevens' hands; the top of the Ziploc bag containing Fontenette's wallet and cards; the handle of the bloodstained knife; and the barrel and grip of the Airsoft gun. Many of the DNA results were incomplete and not suitable for comparisons. The DNA mixture obtained from the swab of Fontenette's right-hand fingernail was of at least three individuals with at least two male contributors "and a partial major female contributor [from] which Jeanette Stevens cannot be excluded." The non-sperm fraction from his penis was a mixture of three individuals with two

8

male contributors, and Stevens, Fontenette, and Jeanette "cannot be excluded as contributors to this mixture." A single-source male DNA profile was obtained from the swab of the Ziploc bag that matched Stevens' DNA profile. The results from the Airsoft-gun swabs were both mixtures "of at least three individuals with a partial major male contributor from which Mark Stevens cannot be excluded," but from which Fontenette could be excluded.

HCSO Sergeant Mark Opiela, the primary detective in the case, testified at length about four interviews that he conducted with Stevens. A video recording of each interview was also admitted into evidence. In the first interview, done shortly after police first arrived at Stevens' home, Stevens stated that he and Jeanette had invited Fontenette—whose name he stated he could not remember—to their home to drink and watch a movie after the Railhouse Bar closed. Stevens described two fights, the first occurring in the living room and the second in the bathroom. He stated that the first fight began when Fontenette attacked him after he confronted Fontenette for hitting on Jeanette. Stevens stated that he hit Fontenette a couple of times in his stomach, that Fontenette hit him "[m]ostly in the head," that he fell to the ground, that Fontenette "started choking [him] out," and that he got loose and thought the fight was over. Opiela testified that he did not notice any abrasions or injuries to Stevens' neck.

When describing the second fight, Stevens stated, "Me and my wife were gonna go to bed. Next thing I know, I'm going to the bathroom, and he walks into our bedroom and into the bathroom and starts wailing on me." He stated that he got Fontenette off of him and that "the knife was there." When asked if he used the knife, Stevens chuckled and replied, "I think it's pretty self-explanatory." He stated that he stabbed Fontenette in his side and that he did not intend to kill him.

Opiela testified that at no point during the interview did Stevens allege that Fontenette had sexually assaulted or attempted to sexually assault Jeanette or assert that he, Fontenette, and Jeanette had engaged in sexual acts. Consequently, Opiela testified, a sexual assault forensic examination was not performed on Jeanette.

During the second interview, conducted while Stevens was receiving treatment at the hospital later on the 26th, he stated that he may have known Fontenette's name at one time but could not recall it. Stevens stated that he met Fontenette through Stevens' friend Rushing and that he, Jeanette, and Fontenette left the Railhouse Bar after last call around 10:45 p.m. Opiela testified that as in the first interview, Stevens did not allege sexual assault nor mention that consensual sexual contact had occurred. He also testified that the nurse treating Stevens had stated that he did not have a laceration on top of his head and that after cleaning the dried blood, she stated that she "didn't see anything."

The third interview was held at the police station four days after the alleged murder. Stevens began the interview by stating that he had discussed the case with an attorney and later stated that he had also talked about what happened with Jeanette but that he and she were "so blank on a lot of things, missing hours."[3]

Opiela testified that for the first time, Stevens asserted that there was a sexual component to the incident, that the conversation at the home had "mutual[ly]" become sexual, and that there had been unwanted attempted sexual contact between Fontenette and Jeanette when Fontenette tried to come between her and Stevens. Stevens denied that he and his wife engaged in intercourse and stated that neither he nor she were naked.

---

[3] Elsewhere, however, Stevens stated that he and Jeanette "didn't talk at all."

10

He described only one fight, which began in the master bedroom when Fontenette tried to force himself on Jeanette—who was making out with Stevens on the bed—and pushed Stevens, causing him to trip over the chest at the foot of the bed. He stated that Jeanette then pushed Fontenette, that she fell off the bed instead, and that Fontenette continued to move toward her, "getting down towards her." He grabbed Fontenette's arm, and Fontenette began "wailing on [him]," hitting him mostly in the head. Fontenette somehow forced him to the ground in the bathroom and placed him in a chokehold, screaming, "Fuck you. I'm gonna kill you." Stevens stated that while they struggled on the bathroom floor, he tried unsuccessfully to put Fontenette in a headlock, punch him in the throat, or hold him down with his forearm. He stated that he thinks that Fontenette let him go because Stevens was "almost done."

He stated that once freed, he ran out of the room and grabbed the Airsoft gun from the drawer of the desk by the back door and the knife from where it hung by the front door. As he was running back to the room, he heard the door slam and Jeanette scream, so he "went through the door" and saw Fontenette standing over Jeanette near the foot of the bed. He stated that he heard Jeanette say, "Get away from me," and that Fontenette told her, "I'm going to fuck you." Holding the Airsoft gun in his left hand and the knife in his right, he told Fontenette to leave, but he instead came toward Stevens. Opiela testified that from Stevens' account, Fontenette would have had to "go through" Stevens to leave the room. Stevens stated that he fired two or three BBs, that Fontenette flinched and "backed for a second," that he kept coming when he realized that it was not a real gun, and that Stevens then stabbed him.

He twice acted out the stabbing. Opiela testified that the motion was from his chest outward in an underhand grip and that he would have likely struck Fontenette's right side, not the upper left of his back. During the second reenactment, Stevens for the first time stated

11

that Fontenette had swung at him before the stabbing and missed. He stated that he did not call 911 afterward but instead called his brother and asked for help disposing of Fontenette's body. He further stated that after the call, he passed out on the bed, that he woke up on the ground, and that when he came out of the bedroom, the police were already at the door. When asked why he had concealed details, Stevens replied that his attorney had asked the same thing and that he was scared and had not known what to do.

Stevens also stated that he went through Fontenette's wallet to see who he was but did not remember putting its contents in the Ziploc bag. He stated that he put the knife on top of the chest, that the Airsoft gun should have been "right in that area" and that he did not remember putting it in a dresser. He stated that it would surprise him if police had found Fontenette's keys in his shorts pocket. Speaking of the Airsoft gun's location, he stated, "Again, I panicked," and, "Jesus fucking Christ, that's fucking stupid." Opiela testified that the Ziploc bag would not have been visible or in plain sight had officers not entered the home, that Fontenette's keys were not in plain sight even in the home, and that officers would not have discovered the keys had they not seized Stevens' shorts. He also testified that the Airsoft gun was found underneath clothing inside a dresser in the master bedroom, which was a "concealed spot."

The fourth interview—conducted five months after the alleged murder and after Opiela had disclosed the DNA test results to Stevens—was again held at the station. Stevens stated that he remembered "a few things . . . after counseling and going over and over and over [it] again" and clarified, "A lot of it I didn't remember right away." He acknowledged that the DNA results contradicted his previous statements and explained that Jeanette had "started remembering things" after an attorney said something to her. He stated that she remembered more than he did and that they had "even gone into the bedroom and . . . tried to make sense of

12

it." Elsewhere, when asked why he had not told the police certain things, he replied that he never had to deal with such a situation before and that other omissions resulted from embarrassment and memory problems.

For the first time, he stated that he and Jeanette were going to let Fontenette "watch," that they both performed oral sex on Fontenette, and that "[i]t was clear from the start that any intercourse or penetration was off the table." Stevens stated that after the oral sex, he and Jeanette were having sex on the bed when Fontenette got on and tried to force Jeanette to open her legs. He stated that Fontenette "clocked [him] in the head" and that he thought Fontenette was wearing a ring because Stevens "still ha[s] dents and scars that apparently [he has] to have the plastic surgery to get rid of." When describing the altercation in the bathroom, he stated that Fontenette not only threatened to kill him but said, "I'm going to fuck her even if I have to kill you." He also stated that it took him approximately seven seconds after leaving the room to get the Airsoft gun and knife and return.

Opiela testified that Stevens again reenacted the stabbing but that it was different from the reenactment during the third interview. This time, Stevens described holding the knife overhanded and making an inward motion. Opiela testified that it would have been possible for Stevens to stab Fontenette in the back this way but that they would have to have been "pretty close."

Discussing his actions after the stabbing, Stevens stated that the call with his brother was an "initial kneejerk reaction" but that "luckily the smart side of [his] brain finally kicked in, and [he] left everything alone." He stated that he could now recall placing the contents of Fontenette's wallet in the Ziploc bag because he "wanted to see who he was," that Fontenette's belongings had been on the kitchen counter, and that he looked at Fontenette's

13

phone and grabbed his keys as well as going through his wallet. He stated that when he woke up on the 26th, Jeanette told him that they needed to call the police; that he said, "I know"; but that the police showed up before they could call.

During the interview, Stevens stated that an application on his cell phone would have recorded his call with his brother. Opiela testified that he performed an extraction of Stevens' phone, and recordings of the call were played for the jury. On the first recording, Stevens told his brother that he "need[ed] help" and was "in trouble." He explained that he could "do it on [his] own if – if need be," that he needed his brother's "expertise," and that Stevens would "take the fall for everything." He asked if his brother was still on parole and if he had seen the show Dexter, laughing and explaining, "It's in my bathroom, bro." He then said that it would be fine if his brother was "not willing" but asked that he "keep [his] mouth shut."

Stevens also stated that he "need[ed] to get rid of a car," that "the drywall has to disappear," and that he "can handle" Rushing. He told his brother that "Jeanette's not so much of a big help right now," adding, "I'll do it on my own. Done it before. Never stateside, but I'll do it." At one point, a female voice told Stevens, "I'm trying to be part of the solution here," and he replied, "I know. I love you." Stevens' brother instructed him to move the car and reassured him, "I'm not calling the cops. Fuck the cops."

On another recording, Stevens' brother asked if Stevens could "pull this off as some kind of fucking accident or suicide or something," to which he replied, "No. I mean there's – that's what Jeanette was trying to do, make it seem like he attacked me, but – uh, yeah, no. Any court will fucking see through that." Opiela testified that Stevens' injuries could potentially have been self-inflicted or inflicted by Jeanette. When his brother asked who could tie Fontenette to Stevens, he stated, "As far as – personal motives go, you don't have to worry

14

about that one. Never knew him until tonight." Stevens' brother cautioned that police would find Fontenette's car at his house, and Stevens responded, "It's gonna leave tomorrow morning around – I don't know – seven or eight." He then stated, "I know what needs to be done, it's just – I can't do it by myself. Jeanette doesn't have the stomach for it. I got the tools. I got the equipment. I got everything." When Stevens' brother told him that police would learn Fontenette's identity, Stevens stated, "You don't have to worry about that. He's a nobody."

On the final recording, Stevens' brother again asked him, "And there's no way you can tell the cops he attacked you first? It was self-defense? I mean, he's dead. You can make up any story you want." Stevens replied, "No. I mean, yes, but no." When his brother insisted that he did not see another way "out of this," Stevens stated, "Yeah, I know. That's why I'm gonna do what I do good." The call ended with Stevens yawning and telling his brother, "Alright, man. I think I'm gonna hit the hay . . . . I'm going to bed."

When asked on cross-examination what he thought happened in the case, Opiela testified:

> I believe there was a sexual altercation or a sexual event that was taking place. I believe that Jeanette Stevens and Brandon Fontenette were about to engage in sexual intercourse. I believe that that either upset or triggered Mr. Stevens and I believe he retrieved the BB gun and he came back with the knife.

He disagreed with Baker's determination that the door was broken down from the inside. When asked if the Ziploc bag was in plain view, Opiela testified, "It was in plain view inside the residence, but it wasn't in plain view to anyone on the exterior of the residence." He also testified that it was not secreted or hidden.

Following Opiela's testimony, Stevens moved for a directed verdict on both counts, and the trial court denied the motions.

15

A.S., called as a witness by the defense, testified that Stevens suffers from PTSD, and that he "always gets really confused and he's mad at the wrong things." He testified that when suffering from an episode, "any random thing will set [Stevens] off and he'll get confused and mad. And we'll get home and he'll – he'll punch a wall. And it will go on for maybe an hour or so, maybe two hours, it very rarely went on two hours. And then – then he would calm down." He also testified that Stevens would throw things, that he once saw Stevens stab a wall with a knife, and that Stevens has "some anger issues" while in an episode.

A.S. testified that he left home around 2 to 3 a.m. on July 26th after hearing "violence" through the wall. He testified that he heard Stevens and "that – Brandon. I heard a lot of thuds on the wall behind me." He also heard Fontenette say, "I could kill you right now," and Jeanette—panicked—yelling, "Stop," and, "You need to get out. Calm down." On cross-examination, he testified that he did not tell M.C. that Stevens was the one who said, "I could kill you right now," and that he had told a police officer that Fontenette—not "someone"—made the statement.

The jury found Stevens guilty of both counts. During the punishment phase of trial, the State presented testimony from Crystal McGaugh, Fontenette's sister-in-law; HCSO Detective David Marshall; HCSO Deputy Robert Blanchard; and HCSO Deputy Thomas McGreevy. The State's exhibits included judgment forms for Stevens' prior convictions, and the defense stipulated to his identity in the judgments. Stevens presented testimony from A.S. and Sarah George, Jeanette's friend. His exhibits included his military records and a letter from his father.

McGaugh provided victim-impact testimony and explained how Fontenette's death had affected his family. Marshall testified about a 2016 incident in which Jeanette called

16

911 to report that Stevens was intoxicated and attempting to break into their home with a propane tank. When officers confronted Stevens, he was dismissive, "shook his buttocks mockingly at [them]," and called himself a "dick." Marshall testified that Jeanette was nonchalant and was not upset or crying.

Blanchard testified that officers were dispatched to the Stevenses' home the same year in response to an overdose call. Jeanette appeared lethargic and reported having consumed several types of medication. Blanchard testified that A.S., who was 13, was present at the time, and that he made a CPS referral.

McGreevy testified that he also responded to the overdose call, that Stevens seemed irate, and that when McGreevy asked if they were going to have a problem, Stevens apologized and calmed down. McGreevy testified that he picked a knife up from the ground near Stevens but that he could not recall if it was already there or had fallen out of Stevens' pocket. McGreevy testified that Stevens explained that he and Jeanette got into an argument, that she threatened to take pills, and that he called 911 after she did so.

A.S. testified that he loves Stevens very deeply. When asked if Stevens would "fly off the handle easily," he testified, "At certain times, yes; and at certain times, no. It was a big toss up. It – I can't tell you what key things there were to set that off, but it really could have been anything."

George testified that Stevens is caring, funny, thoughtful, and very loving toward Jeanette. However, she agreed on cross-examination that a caring person does not punch or stab holes in the wall.

The jury found that Stevens did not prove the issue of sudden passion and sentenced him to life imprisonment for murder and ten years' confinement and a $10,000 fine for

tampering with physical evidence. The trial court ordered that the sentences would run concurrently, as required by law. When asked if it had additional matters, the State replied that "because of the way the indictment reads, there should be an automatic deadly weapon finding as to Count I [murder]." In response, the trial court made an affirmative deadly weapon finding in the murder judgment. This appeal followed.

## DISCUSSION

### I.    Comment on the Weight of the Evidence

In his first issue, Stevens contends that the trial court erred by including a limiting instruction in the guilt-innocence jury charge that improperly commented on the weight of the evidence presented at trial:

> During the trial, you heard evidence that the defendant may have committed wrongful acts not charged in the indictment. The state offered the evidence to show the facts and circumstances surrounding the indicted offense. You are not to consider that evidence at all unless you find, beyond a reasonable doubt, that the defendant did, in fact, commit the wrongful act. Those of you who believe the defendant did the wrongful act may consider it.
>
> Even if you do find that the defendant committed a wrongful act, you may consider this evidence only for the limited purpose I have described. You may not consider this evidence to prove that the defendant is a bad person and for this reason was likely to commit the charged offense. In other words, you should consider this evidence only for the specific, limited purpose I have described. To consider this evidence for any other purpose would be improper.

Stevens asserts that by instructing the jury that the State offered extraneous-offense evidence "to show the facts and circumstances surrounding the indicted offense," the trial court "assumed that the State's evidence was factual" and therefore true. He provides a "far[]from complete tally of some of the main 'bad acts' that came before the jury," concerning evidence of sexual acts, his statements on the call recordings, and photographs of him and

18

Fontenette—offered, Stevens asserts in his briefing, "to show that the decedent was more largely endowed than [him]."

### *Error*

Article 36.14 of the Texas Code of Criminal Procedure provides in relevant part that a trial court shall deliver to the jury a written charge "not expressing any opinion as to the weight of the evidence." Tex. Code Crim. Proc. art. 36.14. The primary reason for the rule is that an instruction "by the trial judge to the jury on the weight of the evidence reduces the State's burden of proving guilt beyond a reasonable doubt to the jury's satisfaction." *Brown v. State*, 122 S.W.3d 794, 798 (Tex. Crim. App. 2003) (quoting 43 Dix & Dawson, *Texas Practice: Criminal Practice and Procedure* § 36.36 (2d ed. 2001)). It is "axiomatic" that a trial court may not single out certain evidence and comment on it, *Russell v. State*, 749 S.W.2d 77, 78 (Tex. Crim. App. 1988), and that a charge that "assumes the truth of a controverted issue is a comment on the weight of the evidence and is erroneous," *Whaley v. State*, 717 S.W.2d 26, 32 (Tex. Crim. App. 1986); *see Russell*, 749 S.W.2d at 78 ("[W]hen a judge, in his charge to the jury, suggests that certain evidence is true or is untrue, that is a comment on the weight of the evidence.").

To fall afoul of Article 36.14, an instruction need not create a mandatory presumption or implicate a non-statutory evidentiary-sufficiency rule; on the "near end of the 'improper judicial-comment' scale" are instructions that are merely "unnecessary and fail[] to clarify the law for the jury" or that "obliquely or indirectly convey some opinion on the weight of the evidence by singling out that evidence and inviting the jury to pay particular attention to it." *Brown*, 122 S.W.3d at 801. Moreover, even an instruction that focuses a jury's attention on a *type* of evidence, but "does not pluck out any *specific* piece of evidence," may be erroneous.

19

*Id.* (emphasis added); *but see Beltran De La Torre v. State*, 583 S.W.3d 613, 617 (Tex. Crim. App. 2019) (observing that even "innocent attempt to provide clarity for the jury by including a neutral instruction can result in an impermissible comment on the weight of the evidence" by "singl[ing] out a particular piece of evidence for special attention,'" which the jury may then focus on as guidance from the judge" (quoting *Rocha v. State*, 16 S.W.3d 1, 20 (Tex. Crim. App. 2000))); *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008) (explaining that outside of certain statutorily-recognized exceptions, "a trial court should avoid any allusion in the jury charge to a particular fact in evidence, as the jury might construe this as judicial endorsement or imprimatur").

The Court of Criminal Appeals has recommended that, to ensure compliance with Article 36.14, "a trial judge should, as a general rule, avoid including non-statutory instructions in the charge because such instructions frequently constitute impermissible comments on the weight of the evidence." *Beltran De La Torre*, 583 S.W.3d at 617. In determining whether an instruction is a comment on the weight of the evidence, we consider the court's charge as a whole and assess the probable effect of the instruction on the jury in the context in which it was given. *O'Connell v. State*, 17 S.W.3d 746, 748 (Tex. App.—Austin 2000, no pet.); *Delapaz v. State*, 228 S.W.3d 183, 212 (Tex. App.—Dallas 2007, pet. ref'd); *see Russell*, 749 S.W.2d at 79.

The challenged instruction in this case appears to be a limiting instruction combining statutory language from Article 38.36 of the Texas Code of Criminal Procedure and Rule 404(b) of the Texas Rules of Evidence. *See* Tex. Code Crim. Proc. art. 38.36; Tex. R. Evid. 404(b). Article 38.36 provides that in murder cases, both parties may offer evidence "as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going

20

to show the condition of the mind of the accused at the time of the offense." Tex. Code Crim. Proc. art. 38.36(a). While instructions based on Article 38.36 are "permissible," *Roberson v. State*, 144 S.W.3d 34, 42 (Tex. App.—Fort Worth 2004, pet. ref'd), and "traditional part[s] of murder jury charges," *Delgado v. State*, 635 S.W.3d 730, 746 (Tex. App.—Dallas 2021, pet. ref'd), they are not required, *Owens v. State*, 549 S.W.3d 735, 745 (Tex. App.—Austin 2017, pet. ref'd); *see Delgado*, 635 S.W.3d at 746–47 (listing cases holding that Article 38.36 instructions are not improper).

In contrast, Rule 404(b) prohibits the State from introducing extraneous-offense evidence—of crimes, wrongs, or other bad acts—"for the sole purpose of showing the accused acted in conformity with his past bad character towards the victim and thus murdered the victim." *Smith v. State*, 5 S.W.3d 673, 678 (Tex. Crim. App. 1999) (citing Tex. R. Crim. Evid. 404(b); *Montgomery v. State*, 810 S.W.2d 372, 386 (Tex. Crim. App. 1990) (op. on reh'g 1991)). In *Smith*, the Court of Criminal Appeals held that Rule 404(b) is congruous with Article 38.36 and that evidence admissible under the article may nevertheless be excluded under the rule. *Id.* at 679. Thus, Rule 404(b) does not automatically bar evidence admissible under Article 38.36(a), *id.* at 678, so long as the evidence is admissible for a non-propensity purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," Tex. R. Evid. 404(b)(2). On request, a Rule 404(b) instruction should caution the jury that it can only consider extraneous misconduct evidence if "(1) it believes beyond a reasonable doubt that the defendant committed such misconduct and (2) then only for the limited purpose for which it was admitted." *Valadez v. State*, 663 S.W.3d 133, 142 (Tex. Crim. App. 2022).

Here, the trial court instructed the jury that the State offered evidence that Stevens may have committed extraneous offenses "to show the facts and circumstances surrounding the indicted offense," that it could not consider the extraneous-offense evidence unless it found that Stevens committed the wrongful acts beyond a reasonable doubt, and that it could not consider the evidence for propensity purposes but only for the limited purpose described by the court. The State argues that the instruction concerned same-transaction contextual evidence and was therefore unnecessary but harmless. Alternatively, it argues that proving "the relevant facts and circumstances surrounding the killing"—one of the bases for admissibility under Article 38.36—is also a non-propensity purpose for which evidence is admissible under Rule 404(b) and thus, by accurately stating the law, the trial court's instruction was not an impermissible comment on the weight of the evidence.[4] We need not resolve that question in the present appeal because, assuming without deciding that the instruction was erroneous, it did not egregiously harm Stevens.

### Harm

The standard of review for jury-charge error depends on whether the error was preserved at trial. *Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g 1985). When, as here, the

---

[4] Texas courts have been largely silent on the precise overlap and demarcation between Article 38.36 and Rule 404(b). At least one court has concluded that clarifying the defendant's mental state and the prior relationship between the defendant and the victim are non-propensity purposes for which evidence is admissible under rule 404(b). *See Stafford v. State*, 248 S.W.3d 400, 412 (Tex. App.—Beaumont 2008, pet. ref'd). The Court of Criminal Appeals has similarly suggested that "in cases in which the prior relationship between the victim and the accused is a material issue, illustrating the nature of the relationship may be the purpose for which evidence of prior bad acts will be admissible." *Garcia v. State*, 201 S.W.3d 695, 703 (Tex. Crim. App. 2006).

defendant does not make a timely objection during the proceedings below, we must determine whether the record establishes that the error caused him "egregious harm." *See Gonzalez v. State*, 610 S.W.3d 22, 27 (Tex. Crim. App. 2020). "Neither party bears a burden of production or persuasion with respect to an *Almanza* harm analysis, the question being simply what the record demonstrates." *Hollander v. State*, 414 S.W.3d 746, 749–50 (Tex. Crim. App. 2013) (citing *Warner v. State*, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008)).

Errors that result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *Gonzalez*, 610 S.W.3d at 27; *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *see also Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019) (stating that egregious harm occurs when the error "created such harm that the appellant was deprived of a fair and impartial trial"). The appellant must have suffered actual, and not merely theoretical, harm. *Gonzalez*, 610 S.W.3d at 27. In determining whether egregious harm exists, we must evaluate the entire record in light of *Almanza*'s four factors: 1) the complete jury charge, 2) the arguments of counsel, 3) the entirety of the evidence, including the contested issues and weight of the probative evidence, and 4) any other relevant factors revealed by the record as a whole. *Id.*; *Hollander*, 414 S.W.3d at 749–50 (citing *Almanza*, 686 S.W.2d at 171). In some instances, however, a single consideration may persuade a reviewing court that the risk of harm is so minimal that it precludes a finding of egregious harm. *Gonzalez*, 610 S.W.3d at 27 (citing *French v. State*, 563 S.W.3d 228, 239 (Tex. Crim. App. 2018)).

Stevens asserts that the limiting instruction egregiously harmed him because his theories of self-defense and third-party defense "might have fared better" had the "pointless instruction" not "exacerbated" "certain distinctly unsavory additional facts," because the

23

instruction emphasized "matters in the record not directly connected with the validity or lack of validity of [his] defensive arguments," because his statements on the phone-call recordings should not have been subject to a Rule 404(b) limiting instruction, and because the instruction "gratuitously emphasized matters that negated any force [his] defensive evidence might have had."

### A.     Entirety of the Jury Charge

Far from violating Stevens' due-process rights or undermining his ability to raise defensive theories, the full charge mitigated the risk that the jury would use extraneous-offense evidence for propensity purposes.  The trial court instructed the jury that he was presumed innocent, that the State bore the burden of proof "throughout the trial," that Stevens did not "have the burden to prove anything," and that the State must prove every element of each offense beyond a reasonable doubt.  Jurors were also instructed that they alone "review the evidence and determine the facts and what they prove" and "judge the believability of the witnesses and what weight to give their testimony."   Moreover, the trial court expressly cautioned the jury that "[n]othing the judge has said or done in this case should be considered by you as an opinion about the facts of this case or influence you to vote one way or the other."

Although the instruction in question emphasized potential wrongful acts committed by Stevens and may have suggested that such acts were true, in other respects it was circumscribed and worded in such a way as to minimize the risk of appearing to endorse the purpose for which the evidence was offered.  The trial court instructed that the State had offered evidence that Stevens "*may have* committed wrongful acts not charged in the indictment," that it *offered* the evidence *to show* the facts and circumstances surrounding the charged offense, that

the jury could not consider the evidence unless it found beyond a reasonable doubt that Stevens committed a wrongful act, that the jury could consider the evidence only for the "limited purpose" described, and that the jury could not consider the evidence "to prove that the defendant is a bad person and for this reason was likely to commit the charged offense" (emphasis added).

The court further instructed the jury that even if it unanimously agreed that the State had proven the elements of murder beyond a reasonable doubt, it must then consider "whether the defendant's act was justified by self-defense or defense of a third party." In providing the law governing claims of self-defense, the trial court instructed the jury that Stevens "is not required to prove that the defense of self-defense applies to this case. Rather, the State must prove, beyond a reasonable doubt, that self-defense does not apply to the defendant's conduct." Similar language was provided about the burden of proof for third-party defense claims. Such instructions lessened the risk that the jury would shift or reduce the State's burden, the principal objective behind the prohibition against comments on the weight of the evidence. *See Brown*, 122 S.W.3d at 798.

For these reasons, we find that the first factor weighs against a finding that Stevens was egregiously harmed.

### B.      State of the Evidence

The second *Almanza* factor requires us to review the state of the evidence, including the contested issues and weight of probative evidence. *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). Under this factor, "we look to the state of the

evidence to determine whether the evidence made it more or less likely that the jury charge caused appellant actual harm." *Arrington v. State*, 451 S.W.3d 834, 841 (Tex. Crim. App. 2015).

In at least one respect, Stevens' characterization of the instruction's effects is self-contradictory. He argues both that the extraneous-offense evidence emphasized by the instruction was "not directly connected" with his "defensive arguments" and that the evidence simultaneously "negated" the force of his defensive evidence. This may result from his overbroad understanding of the evidence comprehended by the instruction. He asserts that merely by instructing the jury that the State offered evidence that he may have committed "wrongful acts," the trial court "exacerbated" and "gratuitously emphasized" each of the following matters: the "'swinger' conte[x]t" of the case; a photo showing his penis; DNA results suggesting that he performed oral sex on Fontenette; the conversation with his brother discussing how to conceal evidence and dispose of Fontenette's body; his laughing at times during the call; his referring to Fontenette as a "nobody"; his statement during the fourth interview that he had performed oral sex on Fontenette; and his "apparently" discussing his having "'chopped up' a body while overseas on military duty."

As Stevens appears to recognize in arguing that the listed evidence should not have been subjected to a Rule 404(b) limiting instruction, all but the last matter are not extraneous offenses. "An extraneous offense is any act of misconduct, whether resulting in prosecution or not, that is not shown in the charging papers. It is an offense that is 'extra, beyond, or foreign to the offense for which the party is on trial.'" *Manning v. State*, 114 S.W.3d 922, 926–27 (Tex. Crim. App. 2003) (quoting *Powell v. State*, 137 S.W.3d 84, 89 (Tex. App.—Tyler 2000), *rev'd on other grounds*, 63 S.W.3d 435 (Tex. Crim. App. 2001)). The evidence must include "some sort of extraneous *conduct* on behalf of the defendant which forms

part of the alleged extraneous offense"; statements concerning mere "inchoate thoughts" of wrongdoing—such as Stevens' discussion of concealing evidence and disposing of Fontenette's body, his calling Fontenette a "nobody," or his laughing on the call recordings—do not involve conduct "which alone or in combination with these thoughts could constitute a bad act or wrong, much less a crime." *Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993) (en banc) (emphasis added). The photo depicting Stevens' penis, which the State explained at trial it was offering to show motive, similarly does not implicate any wrongdoing or criminal conduct on his part.

Even if evidence that Stevens and Jeanette engaged or intended to engage in consensual sexual acts with Fontenette or that Stevens performed oral sex on Fontenette somehow constitutes evidence of wrongful acts, it was admissible without a limiting instruction under the same-transaction-contextual-evidence exception to rule 404 "to show the context in which the criminal act occurred." *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000) (citing *Archer v. State*, 607 S.W.2d 539, 542 (Tex. Crim. App. 1980), *abrogated on other grounds by Wilson v. State*, 977 S.W.2d 379, 380 (Tex. Crim. App. 1998)); *see Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993) (holding that same transaction contextual evidence is admissible without a limiting instruction). The exception applies "where several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, whether direct or circumstantial, of any one of them cannot be given without showing the others." *Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993). Same-transaction evidence is admissible "to illuminate the nature of the crime alleged," *Camacho*, 864 S.W.2d at 532, and because "[t]he jury is entitled to know all

relevant surrounding facts and circumstances of the charged offense," *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011).

Evidence that Stevens, Jeanette, and Fontenette engaged in sexual acts was indivisible from the charged offenses:  it explained Fontenette's presence at the Stevenses' home, provided the bases for both the State's theory of motive and Stevens' theories of self-defense and third-party defense, underlaid Stevens' gradual disclosures and changing accounts to police, and was central to understanding other evidence in the case, including the DNA results.  The charged offenses would thus have made little sense without the evidence, which was necessary to the jury's understanding.  *See Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000).

Thus, because all but one of the matters listed by Stevens do not concern extraneous offenses or constitute same-transaction contextual evidence or evidence admissible under Article 38.36, no limiting instruction was required for their admission.  *See Camacho*, 864 S.W.2d at 532; *Owens*, 549 S.W.3d at 745.  His characterization of the remaining evidence as his "vague but disturbing talk . . . about his having 'chopped up' a body while overseas on military duty (apparently)" is hyperbolic and appears to refer to the following exchange on one of the call recordings:

> Stevens: What I need to know right now is if I have help or not.  'Cause Jeanette's not so much of a big help right now.
>
> Brother: Yeah, you got help.
>
> Stevens: Like I'll do it on my own.  Done it before.  Never stateside, but I'll do it.

However, even assuming that the jury would have understood the trial court's limiting instruction to emphasize the statement in question, Stevens did not request a contemporaneous limiting instruction at the time the recording was offered or admitted into

28

evidence, and thus it was admitted for all purposes. *See Hammock v. State*, 46 S.W.3d 889, 895 (Tex. Crim. App. 2001) ("Because appellant did not request a limiting instruction at the first opportunity, the evidence was admitted for all purposes."). Consequently—as with all of the evidence listed by Stevens—to the extent that the trial court's limiting instruction emphasized the evidence, it did so by unnecessarily restricting the purposes for which the jury could consider it. To the extent that the court commented on the weight of the evidence, it did so to Stevens' benefit.

Finally, the matters listed by Stevens were uncontroverted at trial; they were, in fact, part of his defensive strategy. Defense counsel did not deny that sexual acts occurred between Stevens, Jeanette, and Fontenette but instead asserted only that Fontenette had attempted to go beyond the agreed acts and engage in vaginal intercourse. Likewise, defense counsel did not argue—nor did any witness testify—that Stevens did not make the statements recorded by his cell phone's application, that he had not previously concealed evidence or disposed of a body, or that the photograph depicting his penis was inauthentic. Rather, the defense's case centered on theories of self-defense and third-party defense and purported deficiencies in the investigation and DNA testing. Thus, the second factor weighs strongly against a finding that Stevens was egregiously harmed.

### C. Parties' Arguments and Other Relevant Information in the Record

Under the third *Almanza* factor, we consider whether any statements made during the trial by the prosecutor, defense counsel, or trial court may have exacerbated or ameliorated the error in the jury charge. *Arrington*, 451 S.W.3d at 844. Here, the only relevant statement

made by the trial judge—to the jury at the start of trial—goes some way toward ameliorating the impact of any comment on the weight of the evidence in the guilt-innocence charge:

> [D]on't read into anything that I may or may not do in the case regarding the case. I will be ruling on objections. I'll be sustaining an objection if I believe it is a good objection, overruling an objection if I believe it is not a good objection. Do not read into anything on that. You can tell that the lawyers in this case are good. We are in court together almost every day on other cases. And so do not read into anything that I may do with regard to this case. I truly am neutral in this case.

During voir dire, both sides questioned the panel about the Stevenses' "alternative lifestyle," asking prospective jurors whether they were familiar with "swinging" and whether evidence of the lifestyle would affect their ability fairly to consider the case. No veniremembers indicated that the subject would cause them to lose their impartiality or that they had ethical or religious objections to the topic. And by screening the panel for such bias, the questioning likely ameliorated the risk of egregious harm resulting from the jury's eventual consideration of evidence of sexual acts involving Stevens, Jeanette, and Fontenette.

Similarly, defense counsel, who in his opening statement preemptively addressed both the sexual evidence and phone calls, told the jury that "things get sort of naughty between" Stevens, Jeanette, and Fontenette, that it would hear evidence that Stevens and Jeanette performed oral sex on Fontenette, that "[t]here is no penetration and there is no sex[, but e]verything else is fine," and that Stevens did not want to tell officers that that he performed oral sex on another man because "[y]ou've got a very proud man who this type of behavior in the military was frowned upon." The State, by contrast, argued only that Stevens, Jeanette, and Fontenette "proceed to have some sort of sexual encounter, the three of them together," and that "it goes horribly wrong."

With respect to the recordings' contents, the theme of the State's case—expressed repeatedly in both its opening and closing statements—was that "[t]he coverup proves the crime." Defense counsel, in attempting again to inoculate the jury, more conspicuously and problematically framed the anticipated evidence in his opening:

> So Mark gets on the phone with his brother, Scott. Brother Scott Stevens has got in some trouble up in Louisiana and had a little experience with the criminal justice system. You can tell from the intoxication level of the phone call that [Stevens] was in shock or out of his mind or something. And they start talking about – referencing around about disposing of the body. That is true. Brother goes, [']Well, can you spin it as self-defense? Can you spin it as a suicide?['] Mark says, [']No.[']
>
> . . . .
>
> I will have to say the phone call is somewhat troubling. But how would you expect somebody to act?

Both sides likewise discussed the phone recordings at length in their closing arguments. The State played portions of the recordings, reminded the jury that it "heard the phone calls with the defendant to his brother asking for advice on how to get rid of the body," and argued that "[t]hose calls . . . show you what happened." In particular, the State elaborated, referring to the "ghoulish calls":

> Think about how depraved you have to be, your first instinct after stabbing someone to death is to call your brother for assistance, chopping up and disposing of that body. He denies there's a plan to cover this up, he denies he's tampering with evidence but that's his first instinct.
>
> No 9-1-1 in those phone calls Detective Opiela did, just those. Didn't call 9-1-1, he called his brother to dispose of the body. Because after all, from Mark Stevens' perspective, Brandon Fontenette is a nobody, easily disposable.
>
> . . . .

31

"Let's cut him up and toss him away." But this is defending Jeanette? This is self-defense? Come on, Ladies and Gentlemen, you have to leave your biases and prejudices at the door, but you don't have to leave your common sense.

. . . .

Does he ever mention in those phone calls – State's Exhibit No. 60, if you want to go back and review them – ever mention anything to his brother about Brandon Fontenette attempting to sexually assault Jeanette Stevens during those calls?

No, not a word, because it didn't happen. It's a fantasy, it's make believe.

Yet defense counsel, although also emotive in describing the calls during his argument, attempted to redirect the jury toward the State's burden, again lessening the risk of egregious harm resulting from any emphasis of the evidence by the trial court's instruction:

And I was ultra pissed off when I was listening to Mark Stevens' phone calls. It was disgusting, it was disappointing and there's something about hearing it over these speakers and in this courtroom that made it more difficult. But I'm gonna ask y'all to do something, which is gonna be very difficult, and that's to do your duty as jurors. Just like [the State] said, we're putting our sympathy aside, we're setting our bias and prejudice aside.

The phone calls were made after the incident. Is it – is it evidence of what might have happened?

Sure, it is, but let's, at least, look at the evidence we have been presented beyond the phone calls.

. . . .

I want you to set your bias and prejudices aside. That's gonna be difficult. I still have that phone call replaying in my head. But the phone call was after the fact and the phone call was made with someone that has a skewed vision of what self-defense is and what's not and who's clearly not a legal scholar, who had just had his head bashed in, who was drunk as shit, right? It's a bizarre call. It's a bizarre call. But does the making of that phone call get the State to disproving self-defense and defense of a third person, beyond a reasonable doubt?

32

Both sides also attempted to downplay any prejudicial tendency of the evidence of swinging or Stevens' performance of oral sex in their closing arguments. The State did not directly mention oral sex, obliquely stating only:

> Now he wants to say this was some sort of embarrassment. Ladies and Gentlemen, that was 2018, we're now in 2021, no one cares about that stuff anymore.
>
> I mean, the idea of two men having sexual contact with each other is passe at this point, there's nothing to be embarrassed about.

Defense counsel acknowledged that "the evidence is pretty undisputed that they all three were getting naughty together, consensually," but reminded the jury that no one had expressed concern with swinging during voir dire and asked that jurors "not judge Mr. Stevens or even Mr. Fontenette or anybody involved regarding what was happening in that room, consensually."

At no time through its questioning, cross-examination, or argument did the State direct jurors' attention to the relative sizes of Stevens' and Fontenette's penises. Nor did defense counsel, other than to state in his closing, "I really hate to get lewd and crude, but we've seen pictures we probably shouldn't have to have seen." In addition, neither side referenced Stevens' recorded statement that he had previously engaged in some potentially troublesome activity overseas. This factor is therefore neutral or, at most, weighs only slightly in favor of finding that Stevens was egregiously harmed.

We do not find, nor does Stevens assert, that there is other information in the record relevant to our determination of whether he was egregiously harmed by the trial court's limiting instruction.

33

### E. Consideration of the Four Factors

The only factor that weighs in favor of finding egregious harm, and does so at most but slightly, is the parties' arguments. Because the other factors weigh against such a finding, we conclude that Stevens was not egregiously harmed by the inclusion of the trial court's limiting instruction.

He fails to show that he suffered actual—and not merely theoretical—harm, asserting only that his self-defense and third-party defense claims "might have fared better" in the instruction's absence. *See Gonzalez*, 610 S.W.3d at 27. Moreover, all but one of the matters that he contends were improperly emphasized by the instruction do not concern extraneous offenses, and he does not satisfactorily explain, therefore, how the jury would have reasonably understood "wrongful acts" to refer to them. Indeed, whether because they were not extraneous offenses, because they were part of the same transaction as the charged offenses, or because Stevens failed to request a contemporaneous limiting instruction, none of the matters he identifies required a limiting instruction, and the trial court could only have helped him by restricting the purposes for which the jury could consider the evidence. Finally, the matters he lists were uncontroverted, and any risk of harm was mitigated by the rest of the charge; the parties' questioning during voir dire; the trial court's pretrial statement to the jury; and portions of the parties' argument. Accordingly, we overrule his first issue.

## II. Legal Sufficiency of the Evidence

In his second issue, Stevens contends that the evidence presented at trial was legally insufficient to support his conviction for tampering with physical evidence or, alternatively, was sufficient to prove only *attempted* tampering. He asserts that by removing

34

items from Fontenette's wallet and placing them in the Ziploc bag on the kitchen counter, he "ma[d]e them more visible and less concealed than before their removal." Similarly, his act of "apparently" placing Fontenette's keys in his shorts pocket, he explains, "did not make the keys any more or less visible or 'concealed' than before."

Due process requires that the State prove, beyond a reasonable doubt, every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *Lang v. State*, 561 S.W.3d 174, 179 (Tex. Crim. App. 2018). When reviewing the sufficiency of the evidence to support a conviction, we consider all the evidence in the light most favorable to the verdict to determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013); *see Musacchio v. United States*, 577 U.S. 237, 243 (2016); *Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018). In our sufficiency review, we consider all the evidence in the record, whether direct or circumstantial, properly or improperly admitted, or submitted by the prosecution or the defense. *Thompson v. State*, 408 S.W.3d 614, 627 (Tex. App.—Austin 2013, no pet.); *see Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We presume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 318; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We consider only whether the factfinder reached a rational decision. *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018); *see Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (observing that reviewing court's role on appeal "is restricted to

guarding against the rare occurrence when a fact finder does not act rationally" (quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010))).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018); *see also* Tex. Code Crim. Proc. art 36.13 (explaining that "the jury is the exclusive judge of the facts"). Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Arroyo*, 559 S.W.3d at 487; *see Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we must defer to the credibility and weight determinations of the factfinder. *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016); *Nowlin v. State*, 473 S.W.3d 312, 317 (Tex. Crim. App. 2015). When the record supports conflicting reasonable inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that resolution. *Zuniga*, 551 S.W.3d at 733; *Cary*, 507 S.W.3d at 757; *see Musacchio*, 577 U.S. at 243 (reaffirming that appellate sufficiency review "does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts'" (quoting *Jackson*, 443 U.S. at 319)). We must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (quoting *Clayton*, 235 S.W.3d at 778).

A person commits the offense of tampering with physical evidence if he, "knowing that an offense has been committed, alters, destroys, or conceals any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in any subsequent investigation of or official proceeding related to the offense." Tex. Penal Code

§ 37.09(d)(1).  The statute contains two different culpable mental states:  "an actor must know his action would impair the item as evidence and he must act with the intent to impair its availability as evidence."  *State v. Zuniga*, 512 S.W.3d 902, 907 (Tex. Crim. App. 2017) (citing *Stewart v. State*, 240 S.W.3d 872, 873–74 (Tex. Crim. App. 2007)).  Likewise, "intent and concealment are two distinct elements of the offense"; a defendant must not only *intend* to conceal an item but must "*successfully conceal something* to be guilty of tampering with evidence by concealment."  *Stahmann v. State*, 602 S.W.3d 573, 581 (Tex. Crim. App. 2020) (emphasis added).

The Court of Criminal Appeals has agreed with our sister court that "[a]ctual concealment requires a showing that the allegedly concealed item was hidden, removed from sight or notice, or kept from discovery or observation."  *Id.* (quoting *Stahmann v. State*, 548 S.W.3d 46, 57 (Tex. App.—Corpus Christi–Edinburg 2018), *aff'd*, 602 S.W.3d 573, 581 (Tex. Crim. App. 2020)). Other than in cases where the "thing" allegedly tampered with is a human corpse, *see* Tex. Penal Code § 37.09(c), the specific identity of the tampered-with evidence is not an element of the offense.  *Zuniga*, 512 S.W.3d at 908 (explaining that only "element" that State must allege in indictment is whether evidence at issue was "a record, a document, or a thing").

In the present case, the State was required to prove—as charged in the indictment—that Stevens was aware at the time he allegedly concealed Fontenette's car keys, wallet, identification, and debit cards that he had cut or stabbed Fontenette with the conscious objective or desire to kill him or to cause him serious bodily injury, with the awareness that his act was reasonably certain to kill Fontenette.  *See* Tex. Penal Code §§ 19.02, 37.09; *Hall v. State*, 283 S.W.3d 137, 159 (Tex. App.—Austin 2009, pet. ref'd); *cf. Barron v. State*, 629 S.W.3d 557,

37

563 (Tex. App.—Eastland 2021, pet. ref'd) ("A person has knowledge of the commission of a murder where that person is aware at the time of his alleged acts that someone intentionally or knowingly caused the death of another individual.").

Opiela testified that Stevens told him that the stabbing was an intentional act, that Stevens never said that it was an accident or resulted from recklessness or carelessness, and that Stevens "definitely intended" to stab Fontenette. Opiela also testified that a knife can be a deadly weapon and that if someone were to stab an individual in the torso, it would constitute an act clearly dangerous to human life. In the video recordings of Stevens' interviews, he acted out the stabbing on multiple occasions. Moreover, M.C. testified that on the night of the alleged murder, A.S. told him that he had heard Stevens say, "I could kill you right now." The jury could therefore have reasonably found that the State proved the first element of the offense, that Stevens knew a murder was committed, beyond a reasonable doubt.

Next, there was ample evidence that Stevens intended to impair the availability of Fontenette's belongings as evidence in any subsequent investigation or official proceeding. In the recordings of his calls with his brother, Stevens asked if his brother was still on parole, stated that he needed his "expertise" and help, asked if he had seen the television show Dexter, and stated, "I know what needs to be done . . . . Jeanette doesn't have the stomach for it. I got the tools. I got the equipment. I got everything." Stevens also stated that he needed "to get rid of a car," that he could "handle" Rushing, that "the drywall has to disappear," that his cell phone was "burnt," and that he knew that he and his brother needed "to get rid of these phones." When his brother told him that the police would "find out where [Fontenette] was last night [because h]e used a credit card or debit card or something," Stevens stated, "You don't have to worry about that. He's a nobody."

38

Similarly, when his brother warned that "the first thing you need to do is move the vehicle," Stevens responded, "Hell, I can put that shit in my garage." Later, Stevens' brother again cautioned, "Once [the police] find the car, they're gonna control everything," to which Stevens replied, "Oh, no. It's gonna leave tomorrow morning around – I don't know – seven or eight." And when his brother once more advised that Stevens was "gonna have to get rid of the car somewhere [and . . .] leave that motherfucker in a parking lot somewhere or something," Stevens stated, "Yep, got that covered. I already know where."

Stevens' statements in the recorded interviews provided additional evidence that he intended to conceal evidence in the case. Although Stevens acknowledged that he had gone through Fontenette's wallet to "see who he was," he repeatedly professed not to know Fontenette's name, telling Opiela at one point, "From the news, I know they say his name's Brandon . . . . I could have sworn he was like Sam or something." He told Opiela that he kept the Airsoft gun used to shoot Fontenette in a desk drawer by the back door of his home and that it should have been near the hope chest in the master bedroom when officers arrived. When told that it was found underneath clothing in a dresser, Stevens replied, "Again, I panicked," and, "Jesus fucking Christ, that's fucking stupid." He also told Opiela that although he looked at Fontenette's phone, grabbed his keys, looked through his wallet, and put everything in a Ziploc bag, it would surprise him if officers found Fontenette's car keys in his shorts pocket. He stated that he "know[s] it looks bad" and that he "didn't know what to do."

Finally, there was also evidence presented from which a reasonable juror could have found beyond a reasonable doubt that Stevens had concealed Fontenette's car keys by hiding them or removing them from notice. *See Stahmann*, 602 S.W.3d at 581. During his final interview, when asked why he put Fontenette's belongings in a plastic bag, Stevens replied that

39

he did so "just to keep [them] all together." Opiela asked if Fontenette's wallet was already on the kitchen counter, and Stevens answered, "[A]ll his stuff was. I went out there, looked at his phone, forgot where I had left it, grabbed his keys, looked through his wallet, put everything in a Ziploc bag, and I'm pretty sure I left the Ziploc bag either on the dresser or the counter. I don't remember."

Luna, the HCSO crime scene supervisor, testified that while Fontenette's wallet, identification, and debit cards were found inside the clear Ziploc bag on the kitchen counter, his keys were discovered in a pair of camo shorts—which were thought to belong to Stevens—on the floor of the master bedroom. Opiela testified that the keys were not in plain view when officers entered Stevens' home and that officers would not have found the keys had they not seized the shorts as evidence. Therefore, the jury could have reasonably inferred that Stevens had taken Fontenette's keys from the kitchen counter and placed them in his own shorts pocket, thereby concealing them.

Because the evidence was legally sufficient to support Stevens' tampering conviction, we need not address his alternative argument that the evidence was sufficient only to prove attempted tampering. Accordingly, we overrule his second issue.

### III.    Parole Instruction

In his third issue, Stevens contends that the trial court erred by failing to include the mandatory parole instruction in the portion of its punishment-phase jury charge setting forth the law applicable to the murder count. He asserts that the jury's note to the trial court during its sentencing deliberations—asking whether "the sentences of the two counts [would] be served concurrently or subsequently"—demonstrates that the question of parole eligibility contributed to

40

its assessment of a life sentence. He also asserts that his life sentence, in light of his "thin criminal history," was sufficiently severe to show egregious harm. In support of his contention, he cites two cases—one from the Court of Criminal Appeals and one from our sister court, respectively: *Igo v. State*, 210 S.W.3d 645, 647–48 (Tex. Crim. App. 2006), and *Villarreal v. State*, 205 S.W.3d 103, 110 (Tex. App.—Texarkana 2006, pet. dism'd).

Subsection 4(a) of Article 37.07 of the Texas Code of Criminal Procedure provides that in the penalty phase of trials for certain offenses, including murder, the trial court must instruct the jury in writing:

> The length of time for which a defendant is imprisoned may be reduced by the award of parole.
>
> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less. If the defendant is sentenced to a term of less than four years, the defendant must serve at least two years before the defendant is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.
>
> It cannot accurately be predicted how the parole law might be applied to this defendant if sentenced to a term of imprisonment, because the application of that law will depend on decisions made by parole authorities.
>
> You may consider the existence of the parole law. You are not to consider the manner in which the parole law may be applied to this particular defendant.

Tex. Code Crim. Proc. art. 37.07, § 4(a); *see* Tex. Code Crim. Proc. art. 42A.054(a)(2) (listing murder as statutory offense for which instruction must be provided).

The trial court in this case provided a subsection 4(a) instruction beneath the headings "SPECIFIC LAW APPLICABLE TO THIS CASE IN COUNT II [Tampering with Evidence]" and "Parole and Good Conduct Time – Count II only." The instruction was not included in the portion of the charge instructing the jury on the law applicable to the murder

41

count. In its brief, the State concedes that the trial court erred by failing to include the instruction with respect to the murder count but argues that the error was harmless. We conclude that the omission was error. *See Cormier v. State*, 955 S.W.2d 161, 164 (Tex. App.—Austin 1997, no pet.) (explaining that "failure to give this mandatory instruction is charge error subject to *Almanza* analysis"); *Sanders v. State*, 448 S.W.3d 546, 548 (Tex. App.—San Antonio 2014, no pet.) (noting that courts have routinely concluded that language from Article 37.07 is mandatory and that trial courts are not authorized to alter instruction from precise statutory language). Because Stevens did not object to the punishment charge or request that the parole instruction be given for the murder count, he must demonstrate that its omission caused him egregious harm. *See Ritz v. State*, 481 S.W.3d 383, 387 (Tex. App.—Austin 2015, pet. dism'd); *Cormier*, 955 S.W.2d at 164.

Referring to a prior version of the parole statute, the Court of Criminal Appeals has previously observed that "the only purpose in allowing jurors to consider 'existence' of parole law and good conduct time is to inform their assessment of punishment; the instruction is 'clearly designed to increase [the] sentence.'" *Arnold v. State*, 786 S.W.2d 295, 300 (Tex. Crim. App. 1990) (quoting *Gabriel v. State*, 756 S.W.2d 68, 70 (Tex. App.—Houston [1st Dist.] 1988, no pet.)). We have likewise recognized that "[a]n instruction to the jury stating that the defendant will be eligible for parole benefits the State, not the defendant, because it could encourage the jury to assess a longer sentence with the expectation that the defendant may not actually serve the entire sentence." *Ritz*, 481 S.W.3d at 387 (citing *Grigsby v. State*, 833 S.W.2d 573, 576 (Tex. App.—Dallas 1992, pet. ref'd) ("Texas courts agree that the State, not appellant, benefits from the parole law instructions . . . . The instruction was designed to increase jury sentences."); *Lemmons v. State*, No. 05–08–00205–CR, 2008 WL 5341043, at *5

42

(Tex. App.—Dallas Dec. 23, 2008, no pet.) (mem. op., not designated for publication) ("[W]e note that the omitted parole law instruction was designed to increase sentences juries assess and therefore benefits the State, not the defendant.")); *see also Vanschoyck v. State*, 189 S.W.3d 333, 338 (Tex. App.—Texarkana 2006, pet. ref'd) ("As several courts have pointed out, the original rationale for the Legislature requiring the inclusion of this issue was not to aid defendants in obtaining more lenient sentences. Most courts have agreed that the parole law instruction chiefly favors the State."). *But see Hooper v. State*, 255 S.W.3d 262, 272 (Tex. App.—Waco 2008, pet. ref'd) ("Courts generally agree that the parole instruction was designed to favor the State and to increase sentences. But it can help the defendant because the jury could learn that the defendant would serve longer than it expected and could be influenced to assess less time."). Consequently, to the extent that the trial court's error impacted the jury's assessment of Stevens' sentence, it likely did so to his benefit.

The only evidence that Stevens cites to show that he was harmed is the jury's assessment of the maximum allowable term of imprisonment. As noted above, however, *Almanza* requires a showing of actual, not theoretical, harm. *Gonzalez*, 610 S.W.3d at 27; *Almanza*, 686 S.W.2d at 174. There is nothing in the record to indicate that the jury's assessment of life imprisonment was influenced by a misunderstanding of parole or good-conduct-time law or that Stevens was denied a fair and impartial trial. Contrary to his argument otherwise, the jury's note, which concerned the possible stacking of his sentences, was not suggestive of confusion on the issue of parole.

Similarly, the relative paucity of his criminal history does not compel the conclusion that the parole instruction's omission was determinative of his life sentence. The jury heard evidence that he shot Fontenette over a dozen times with a Airsoft gun, caused blunt

trauma to his neck, and stabbed him in the back. On a phone call with his brother shortly after the alleged murder, Stevens laughed, discussed destroying and concealing evidence in the case, insinuated that he intended to dismember Fontenette's body, called him a "nobody," and stated that he was going to go to sleep mere feet from where the body lay. Evidence was also presented that Stevens concealed evidence, lied to and misled investigators, and had a history of irrational behavior and angry outbursts. On one occasion, he may have brandished a knife when officers responded to a prior 911 call at his home. His son testified to the ease and unpredictability with which he would enter a rage, and the jury heard him admit that he punched and stabbed holes in his home's drywall.

The cases cited by Stevens are distinguishable and do not support a finding that he was egregiously harmed. In *Igo*, which involved an appeal from the denial of a motion for new trial that alleged jury-charge error, the trial court erroneously informed the jury that the defendant would become eligible for parole earlier than he would. 210 S.W.3d at 646. The Court of Criminal Appeals disagreed with the defendant's contention that the court of appeals had misapplied the "egregious harm" standard because although appellant received the maximum sentence, the Court noted that "a number of other factors mitigate[d] against a finding of egregious harm," including the inclusion of a curative instruction, neither side's mentioning parole during argument on punishment, and the strength of the evidence relating to punishment. *Id.* at 647–68.

Here, despite the absence of a curative instruction, the trial court omitted, and did not misstate, the relevant law; consequently, the jury was not given the erroneous impression that Stevens would be eligible for parole after his actual time served, plus good time, equaled only one-fourth of the sentence imposed. The State did not mention parole or good conduct

44

time in its argument, and—as discussed—the facts surrounding the charged offense were particularly severe.

*Villarreal* is likewise distinguishable. The jury in that case sent the trial court a note asking "how many years [the defendant] would actually serve compared to how many we sentence," and the court, in finding that the defendant was egregiously harmed, emphasized that "the jury obviously had been considering the impact of the parole law on [the defendant]'s punishment" and that the record failed to demonstrate "that the trial court followed the proper procedural steps in responding to this note and then failed to submit the mandatory parole law instruction in accordance with Article 37.07." *Villarreal*, 205 S.W.3d at 110.

For these reasons, we conclude that Stevens was not egregiously harmed by the trial court's error. We overrule his third issue.

### IV.    Deadly-Weapon Finding

In his fourth issue, Stevens contends that the trial court erred by entering a deadly-weapon finding in his murder judgment because the indictment did not allege that he used or exhibited a deadly weapon, the jury did not make an express or implied finding of a deadly weapon, and the evidence did not show the use or exhibition of a deadly weapon per se.

Article 42A.054 of the Texas Code of Criminal Procedure provides in relevant part that "[o]n an affirmative finding regarding the use or exhibition of a deadly weapon . . . , the trial court shall enter the finding in the judgment of the court." Tex. Code Crim. Proc. art. 42A.054(c). The Court of Criminal Appeals has directly recognized four different ways in which a trial court can determine that a trier of fact made an affirmative finding of a deadly weapon:

45

(1) the indictment specifically alleged a "deadly weapon" was used (using the words "deadly weapon") and the defendant was found guilty "as charged in the indictment;"

(2) the indictment did not use the words "deadly weapon" but alleged use of a deadly weapon per se (such as a firearm);[]

(3) the jury made an express finding of fact of use of a deadly weapon in response to submission of a special issue during the punishment stage of trial[; or]

. . . .

(4) the indictment specifically alleges the use of "deadly weapon;" [] the jury charge's application paragraph on a lesser-included offense requires a finding from the jury beyond a reasonable doubt that the defendant committed an offense using the alleged "deadly weapon;" [] and the jury finds the defendant guilty of that lesser-included offense.

*Duran v. State*, 492 S.W.3d 741, 746–47 (Tex. Crim. App. 2016); *see Lafleur v. State*, 106 S.W.3d 91, 98–99 (Tex. Crim. App. 2003); *Polk v. State*, 693 S.W.2d 391, 396 (Tex. Crim. App. 1985).

The Court has also noted, however, that in *Crumpton v. State*, 301 S.W.3d 663, 664 (Tex. Crim. App. 2009), it "seem[ed] to have extended the degree to which courts can rely upon deductive reasoning to determine whether the jury entered an affirmative deadly-weapon finding." *Duran*, 492 S.W.3d at 747. In *Crumpton*, a case involving a conviction for criminally negligent homicide, the Court affirmed the court of appeals' decision that the jury had made an affirmative deadly-weapon finding because (1) the jury found the defendant guilty "as included in the indictment," which expressly alleged that the defendant committed the offense with a "deadly weapon," and because (2) "a verdict of homicide necessarily is a finding that a deadly weapon was used." 301 S.W.3d at 664. As the Court explained with respect to the second basis for its affirmance:

> Having found that the defendant was guilty of homicide, the jury necessarily found that the defendant used something that in the manner of its use was capable of causing—and did cause—death. Therefore the verdict was an adequate basis for the trial court's entry of the deadly-weapon finding in the judgment.

*Id.*

Both we and our sister courts have understood *Crumpton* as permitting a trial court's entry of a deadly-weapon finding based on the deductive-reasoning approach. *See George v. State*, No. 05-18-00941-CR, 2019 WL 5781917, at *10 (Tex. App.—Dallas Nov. 6, 2019) (mem. op., not designated for publication), *aff'd*, 634 S.W.3d 929 (Tex. Crim. App. 2021) ("Having found [the defendant] guilty of capital murder, the jury necessarily found that he used something that in the manner of its use was capable of causing—and did cause—death."); *Perez-Vasquez v. State*, No. 01-15-00882-CR, 2018 WL 2727761, at *15 (Tex. App.—Houston [1st Dist.] June 7, 2018, pet. ref'd) (mem. op., not designated for publication) (determining that because "the indictment alleged that [the defendant] caused the death of [the decedent] with an object, and the jury found that he was 'guilty of murder as alleged in the indictment,'" the jury "necessarily found that [the defendant] used something that in the manner of its use was capable of causing—and did cause—death."); *Mills v. State*, 541 S.W.3d 381, 385 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (explaining that Court of Criminal Appeals recently held that "an affirmative deadly weapon finding can be made when the jury finds the defendant guilty as charged in the indictment and the indictment alleges the defendant caused death or serious bodily injury with a weapon"); *In re Tate*, No. 09-16-00455-CR, 2016 WL 7473853, at *1 (Tex. App.—Beaumont Dec. 28, 2016, no pet.) (mem. op., not designated for publication) ("In some cases, depending on the language in the indictment, the evidence in the trial, and the charge, it is possible that a trial court can infer from a finding on

aggravated assault that the defendant used a deadly weapon in committing the assault."); *Splawn v. State*, No. 10-14-00054-CR, 2015 WL 4710251, at \*3 (Tex. App.—Waco July 30, 2015, no pet.) (mem. op., not designated for publication) (concluding that verdict was adequate basis for trial court's entry of deadly-weapon finding because "[h]aving found [the defendant] guilty of the charged offense of attempted capital murder, the jury necessarily found that [he] used something that in the manner of its use was capable of causing—and did cause—death"); *McCallum v. State*, 311 S.W.3d 9, 18 (Tex. App.—San Antonio 2010, no pet.) (declaring that *Crumpton* allows "the trial court to find the jury made an affirmative deadly weapon finding by finding the defendant guilty of homicide"); *Griffith v. State*, 315 S.W.3d 648, 654 (Tex. App.—Eastland 2010, pet. ref'd) ("Under *Crumpton*, the jury's determination that [the defendant] committed manslaughter necessarily constituted a finding that he used something that in the manner of its use was capable of causing—and did cause—death.").

Here, the indictment charged that Stevens intentionally and knowingly caused Fontenette's death by cutting and stabbing him with a knife or, intending to cause him serious bodily injury, that Stevens committed an act clearly dangerous to human life, namely, cutting and stabbing him with a knife and thereby causing his death. The indictment did not specifically allege that Stevens used or exhibited a deadly weapon, and a knife is not a deadly weapon per se. *See Lafleur*, 106 S.W.3d at 95. The guilt-innocence charge instructed the jury in the law applicable under both theories, and the jury found Stevens "GUILTY of the offense of Murder, as charged." No deadly-weapon special issue was submitted to the jury. However, by finding Stevens guilty of murder as charged in the indictment, the jury necessarily found that he caused Fontenette's death by using something that in the manner of its use was capable of causing—and did cause—death. *See* Tex. Penal Code § 1.07(a)(17)(B) (defining "deadly weapon"). Thus, we

48

conclude that the verdict was an adequate basis for the trial court's entry of the deadly-weapon finding in the judgment form for the murder conviction. We overrule Stevens' fourth issue.

## CONCLUSION

Having overruled each of Stevens' issues, we affirm the judgments of the trial court.

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Triana and Smith

Affirmed

Filed: August 11, 2023

Do Not Publish